Good morning, Your Honors. May it please the Court, Marty Spraw for Petitioner Delia Aguirre Ochoa. In light of recent case law of this Circuit Court, we ask that the Court remand the case so that the agency may properly evaluate Petitioner's claims, specifically under Barajas-Romero v. Lynch, Maldonado v. Lynch, and Bringas v. Sessions. In this case, the agency agreed with the immigration judge that Petitioner failed to meet her burden of proving all of the elements to establish eligibility for asylum, withholding, and CAT. There is no issue asked to the fact that she was found credible by both the board and the BIA— I'm sorry, the IJ and the BIA—and that she belongs to a particular social group. In supporting the IJ's denial, the agency highlights four issues relating to— May I ask you to go a little slower? I apologize, Your Honor. The BIA highlights four issues in relating to the well-founded fear of future persecution, withholding, and CAT. Specifically, first, the Mexican government's ability and willingness to protect Petitioner from the drug cartel. Second, her failure to prove that it would be impossible for her to safely relocate to Mexico. Third, her failure to report her husband's family's conduct to the police in Mexico. And fourth, that she overall failed to establish objectively reasonable fear of future persecution. Without going through all the details of this case, there are a few critical facts that the immigration judge essentially downplayed. Specifically, Petitioner's husband is a blood relative to a nefarious family based in Jalisco. They had deep-seated ties to the founders of the Guadalajara cartel, who are still very active in the drug trade today. Specifically, Rafael Caro Quintero, Ernesto Fonseca, and Angel Felix Gallardo of the Felix Arellano brothers. It was under their direction that several of Petitioner's husbands and uncles kidnapped, brutally tortured, murdered, and disposed of a special agent of the DEA. Petitioner's husband, Petitioner herself, and their three children were lured to the U.S. by the DEA with tourist visas. Upon arrival, the husband became a DEA confidential informant, betraying his family. He provided them with detailed information about their intricate connections to the Guadalajara cartel, as well as vivid descriptions of the murder. He put his family at risk by doing so, by cooperating with the DEA. And as a result of his cooperation, three major cartel heads were convicted in Mexico for the murder of the special agent, although they have since been released by the Mexican authorities. Now, the husband, who was a DEA informant, was in the United States with a special visa, correct? That's correct, Your Honor. He chose to go back to Mexico? He was deported, I believe, in 2006. I'm not sure if it was an administrative voluntary departure or if he actually saw an immigration judge and was deported. Why was he deported? Well, I would say that was what was a mystery to me, is I'm not sure exactly what happened as far as the immigration judge. The story goes from the Respondent's uncle, who was part of this nefarious family, put a hit out on him. And so his response was, rather than go to the police, he went to the DEA agent who was helping the family. The DEA agent provided him with money for a gun, and he got into trouble for having the gun. And he was eventually deported. I believe he had a number of gun charges, and he was deported for those. Hadn't he been or lived in Mexico for a considerable period of time? He's been deported since 2006. But he's been in hiding in Mexico the entire time, Your Honor. He's been approximately between 1,000 to 1,100 miles away from Jalisco. He doesn't have any contact with his family, but for two of his siblings, the family has completely turned their back on him. And he's essentially living as a prisoner in Mexico in hiding. Just out of curiosity, if the husband was the informer, and he has been in Mexico since 2006, and he has not been harmed, why would we want to think that she, if she returned to Mexico, that she would be harmed? Again, Your Honor, as I indicated, he's not freely living open in Mexico. He's in hiding from his family. He's waiting any day. The son testified that he's very depressed. He hardly leaves his home. And he's just basically waiting for the day of reckoning where the cartel will kill him and will find him. So it's not like he's able to freely live a normal life in Mexico. He's been very fortunate so far that he's been able to be in hiding, but he is not freely living there. Was that evidence presented before the immigration judge? Through testimony of the son and the Respondent herself. Okay. The children who were also part of a proceeding with the Respondent in 2002 were also deported to Mexico with the Respondent because in 2000 — I'm sorry, 2012, she was physically removed from the United States by ICE authorities with her two older children who were Mexican-born, and they were all sent to Mexico. The children are still there. We're not denying that fact. The fact that the children have managed to survive in Mexico does not refute her claim of persecution. As to her children, they're not similarly situated to the Petitioner. First, they're blood relatives of the family that she fears, and she's not. Secondly, the daughter is a deaf-mute, and the son who is there with her is her primary caretaker. The Respondent does — does not deny any of those factors that shield or protect her from the ruthlessness of the people that she fears. None of these factors — as in Lim, B.I.N.S., no evidence in the record suggests that her children are similarly situated to her or that they're — they're subject to the similar risk. Nothing in the record supports an inference that their safety will ensure safety for her. According to the record, when she was in Mexico in 2012, Petitioner's husband's cousin warned her that there was going to be a shootout where she was staying and that she should not be in the same location as the children. So to protect them, she left. From her testimony, it appears that the children are in danger whenever she or the husband are present, but not necessarily independent of them. We can't go into the mind of the persecutors as to why they wouldn't harm their own blood relatives, but at the end of the day, it is their nieces and nephews, and they don't have that same familial tie with her. So there is no reason why that would protect her at all. As far as the government's ability to protect her, the record is replete with inferences and information to show that corruption still exists in Mexico. It's very much alive. In Madrigal v. Holder, which the IJ distinguished from this case, and the subsequent cases of Maldonado v. Lynch and Barajas v. Romero, this Court stresses the importance of examining the efficacy of the government's efforts to stop the drug cartel violence, not just the willingness of the national government to do so. In those cases, the court called into question the Mexican government's ability to control one of the cartels. And yet this IJ and the Board base its finding on this very record that's replete with evidence of widespread corruption at the local level, at the police level. After reviewing the country reports from 2009 that this Court relied on in Madrigal, the 2011 reports that this immigration judge and the BIA relied on for this case, and even the most recent 2016 reports, there is no differentiation between them. If anything, it shows that the situation has worsened in Mexico, not improved. In its decision, the Board specifically addresses that the country report cited by the immigration judge concludes that the Mexican government has been largely successful at breaking up cartels and is taking necessary steps to reform the country's police force and judiciary. But what they fail to mention is that in that same record that they relied on, the congressional report shows that the kingpin strategy to take down the top cartel leaders has actually created an escalation of violence. It's more extensive, more volatile, and less predictable. The IJ would have us believe that after Madrigal, somehow things in Mexico have changed so tremendously that you can no longer control the cartel, and that is just wrong. Additionally, when the respondent states that the mafia is everywhere, that she doesn't feel safe to live in Mexico, she's not being unreasonable for this fear. She's right to be afraid. While we recognize that the national government in Mexico is trying to eliminate the police corruption and the drug cartels, this is very much an ongoing effort, rather than a completed reform. Further, in Barajas, this Court found that the country report did not address the situation in this case. And just briefly, Your Honor, as far as her failure to report her husband's family's activities to Mexico, the immigration judge and the board expect her to report her fear to the police, who is corrupt, the local police in Mexico, to identify herself and let them know that she's there when she's supposed to be in hiding and that she's afraid of what would happen to her. This is unreasonable to expect of her. The board expanded their finding, relying on the judges, based on Rahim Zadeh v. Holder, which also this Court has found creates a gap-in-proof requirement for her to show that she, although she didn't report, it is her burden to establish that there's credible evidence to show how the government would have acted. And I want to reserve my time. Thank you, Your Honor. Well, go ahead. I'm sorry. I'm back. Just for correction, on the record, Petitioner's not aware why the husband was removed from the United States. If you review the immigration judge's decision, it says that he was removed from the United States in 2006 due to weapons violations. My position is that substantial evidence does support the board's determination that Petitioner failed to establish a well-founded fear of future persecution in Mexico, based on her husband's status as an informant or on the general strife in the country, because the Mexican government has shown that it is willing and able to protect her, and she can safely and reasonably relocate with her family in Mexico. Do you dispute the fact that the husband is in hiding and is depressed and is waiting for the axe to fall? Well, giving her testimony that she doesn't really see him, I don't know, or communicates with him, I'm not sure how we can guarantee that he — that she knows this information to be true, or if it's just information applied for asylum applications. Where does the information come from that the husband is in hiding and is depressed and is waiting for the axe to fall? Well, the son says that the father is depressed and that he's in Cancun, but there's also testimony in a record that shows that he's been to visit his kids in Jalisco. There's evidence that he's gone to go visit his own brother, who's supposedly one of the members of the family that are supposed to be hunting him down, and he actually lives with one of his brothers in Mexico. He's been between Cancun and Mexicali, so it's not that he's in complete hiding. He's moving around. He's visiting people. So I'm not sure how accurate his fear is in terms of remaining in Mexico. He could be depressed, but — Well, I mean, it's clear that this testimony is taken as credible. Yes. And he's not situated in one fixed place, and he's not out in the open generally. I mean, that seems to be undisputed. It doesn't mean he can't move and he can't see somebody, but — But he's gone to Jalisco to visit his own brother. These are the people that — his family members are supposed to be the persons — Right, so he went to Jalisco once, and that — I mean, that doesn't — that's not inconsistent, is it? Well, I don't know. I think if I was that fearful of the drug cartel, I wouldn't step in a city where all the members of the family are still residing. He also has family members that are there. The petitioner has repeatedly stated under sworn statement that she had no fear of returning to Mexico until her last reentry in December 2012. She filed an application for asylum in 2002, and that application — She abandoned that, correct? Mm-hmm. She abandoned the 2002 — And she abandoned that, and the — right, correct. And the facts or the circumstances that would — that she's relying on today to support an asylum claim were available to her at the time she filed her application in 2002. That said, moving on, while I do recognize that this Court has in Madrigal decided that there's some question about Mexico's ability to be able to protect its citizens, I would like to direct you back to the case to show that in that particular case, they were more fearful, pretty much. I mean, she's general civil strife, yes, but she hasn't pointed to any Los Datos information in the record. She has not — her kids still live there. They've been there for two years. I mean, you can challenge where they're living or where they're not living, but her testimony was that the Mexican cartel can get you anywhere if that's the case. All of her family members that still live there in Mexico, her children, her two children in Mexico, she has a son that testified that traveled back to Mexico on three or four different occasions. Her husband has been living there since 2006. If this is true, if the cartel's reach is that deep and that strong, somebody, at least one person in the family should have been threatened. And I'm saying the testimony in this record consistently shows that, for the most part, that she has not been threatened at all. She hasn't received any threats before she came to the United States in 1987, and she hasn't received any threats up until now. I would also like to state that the record evidence, the country-conditioned evidence about the ability to control, in addition to what the immigration judge laid out about the willingness and all of the advances and gains that have been made, there's additional evidence in the record that shows that the Juarez killings are down 40 percent in 2011. There were improvements seen in cities worst hit by organized crime. There have been greater efforts to control violence made in 2011. The cartels are increasingly finding it more difficult to operate due to the collaboration of the multiple law enforcement entities that are working together, just like what the immigration judge was referring to, the U.S. assisting Mexico, the military, the Army, the Marines. It also shows an extensive amount of kingpins that have been captured and or killed. The people that Petitioner railed against about being fearful of from the beginning, two of them have been incarcerated back then, and two of them are deceased. And she hasn't listed or named any particular cousin that she claims that she fears has approached her, breached her, where they're at, where they're living, where they're located. I'm not sure where the threat from them is coming from, per se, other than she's speculating about potential harm. The immigration judge also did not err in requiring her to establish or provide evidence to support the gap in her evidence from failing to report any harm or wrongdoings to the police. Petitioner has not established past persecutions, so the burden remains on her. Let me just stop you on that point. There seems to be some collision in both the cases and the BIA's rulings on reporting to the police, because on the one hand, they say, well, it's not required to report, but the fact that you didn't report somehow undermines your case. Correct. And so it's you lose, you lose on that. And we have said in Bringus that you can't have a higher evidentiary standard simply because there might be a gap in police reporting. And isn't that really what the BIA was implying here? No. What the board said is that you can either have shown that you filed a report and this type of accident happened, or you can use other incidences that maybe somebody else reported. That's not a higher burden. It's just a matter of trying to fill that gap. And the fact that she didn't present any evidence to show that it hasn't happened to anybody else just undermines her claim that the government is unable or unwilling to protect her. The sheer fact that she's been protected all this time, she herself has been in Mexico, we can't be sure how many times, but based on the record, we know at least six months, at a minimum at six months. But again, due to the vast number of family members, you have 11 siblings that are there, not a single threat to anyone, not to mention that the incidents that give rise to her fear of harm happened 30 some years ago. As for her ability to safely relocate and that it's reasonable, the immigration judge looked at all these factors with regard to her not alleging that she feared harm. Well, the immigration judge said that it was significant that she hadn't reported this conduct, and on this record, therefore, concludes she hadn't met her burden with respect to the inability of the Mexican government to control the cartel. So they tied very directly the failure to report and not meeting her burden, but she could have used anecdotal evidence or evidence of personal knowledge of somebody else she knows that may have actually filed a report and this happened to that person. That doesn't require any extra burden on her. It's just simply filling the gap where the failure of her to file left open to undermine her claim. In terms of safely being able to relocate, Petitioner has, she's 54 years of age, she has an extensive amount of family that still lives in Mexico unharmed in Ocketland, Guadalajara. She herself has been to Tijuana. She has visited her kids in Jalisco. She has traveled all through Mexico without a threat or harm or somebody, you know, so much as throwing a rock at her. But based on these facts that are presented, I mean, equal minds or inquiring minds can decide differently. But the fact that this case is being evaluated based on a substantial evidence record   the Court is required to accept the Board's decision as true unless she has presented evidence to compel a contrary result. Thank you. Just a couple brief points, Your Honor. First of all, as far as her 2002 application, it was her testimony that in 2002 she was desperate to fix her situation. She realized she was out of status with her tourist visa, things weren't looking good for the husband, and she went to a notary or notario unknowingly trying to fix her situation, who was then working with an attorney who, rather than exploring her ability to file for asylum or pursue that claim, withdrew the application and just filed for cancellation of removal. So there is the Respondent was ineffectively assisted by the attorney who helped her in the 2002 case. Additionally, her credibility is not in dispute here. It is very clear that although the case in Madrigal deals with the Cetas, this case deals with the Guadalajara cartel, and that is what the husband testified against. That's who he turned on, basically. He turned his back on. This case is unique in that for her requirement to report what was going on, it really doesn't make sense for her to report it to the Mexican authorities because the threats occurred here, the husband's activity was already investigated by the DEA. The investigation led to arrests and convictions and even murdering of some people in Mexico by the Mexican authorities. So it really doesn't make sense for her to then have an obligation to go to Mexico and report what was already dealt with by the DEA in this country. And with that, I submit, Your Honor. Thank you. Thank you. I thank both counsel for the argument. The case of Ochoa v. Sessions is submitted.
judges: McKeown, Bea, Benitez